Per Curiam.

The respondent objects to the conclusions of law of the Board of Commissioners on Grievances and Discipline on the ground that the evidence does not warrant the following conclusions:
1. Respondent assented to such “solicitation.”
2. The union was “constantly soliciting” FELA claims for respondent and O’Donnell & Schwartz.
3. There was “solicitation.”
4. Respondent “did breed litigation by seeking out persons having FELA claims as clients.”
Respondent asserts that the panel’s recommendation is violative of the First and Fourteenth Amendments of the Constitution of the United States.
Respondent contends that “relator has proven only two isolated instances of possible misconduct” but concedes that respondent “may possibly have been guilty of several instances of poor judgment.”
Finally, respondent pleads that the panel’s recommendation is too severe and “is entirely out of proportion in light of the isolated incidents, actually proven by relator.”
A reading and examination of the record compel this court to conclude that the record supports the report of the board.
The serious complaint against respondent is that which involves the arrangement with O’Donnell & Schwartz for handling FELA cases for the injured members of the Transport Workers Union.
Respondent knew that publicity of his availability as an attorney to represent union members in FELA cases was being given orally in union meetings, and there were written publications addressed to union members and notices posted on bulletin boards in union halls advising of his availability as counsel.
He knew further that lay intermediaries who were union officials were bringing union members to his office to employ him to represent them in FELA cases. At his office, these men, who had not met him before and who often had not heard of him before, signed “Requests To See Counsel” forms and signed contingent fee contracts of employment to represent them in their FELA cases.
In the Valentine case, Wiley, the legal aid chairman of *104 Local 2005, TWU, a lay intermediary, and the respondent called at the hospital to see Valentine on January 13, 1961. Two days before, January 11th, Valentine had suffered injuries on the job, which included three fractures of one leg, two fractures of a hip and a fractured right wrist. When Wiley and respondent saw him in the hospital he was still affected from opiates which he had received, and his right hand, with which he signed the request to see counsel and the contingent contract, was in a cast down to the palm of his hand.
Wiley and respondent requested and obtained the signature of Valentine to a contingent fee contract, and also to a “Request To See Counsel” letter, which were later filled out on a typewriter as to the date of the accident, the number of the local, the date of the request letter and the address of Valentine. These were then sent to O’Donnell & Schwartz in New York.
The contingent fee contract called for a fee of 25% of the first $2,500 and one-third of the amount recovered in excess of $2,500.
Valentine testified that he did not know what the forms which he signed contained. This was disputed by Wiley and respondent.
Neither Valentine nor his wife had ever requested that either Wiley or respondent come to see Valentine in the hospital or at any other time, and Valentine did not know the respondent.
Upon learning that her husband had signed a “Request To See Counsel” letter and a contingent fee contract, Mrs. Valentine called upon respondent to return the contract to her, and, after six or seven months, the contract was returned by Schwartz to the Valentines.
The serious evil of this arrangement is that, although the 25% of the total contingent fee provided to be paid to O’Donnell &• Schwartz was denominated a “forwarding fee” in the agreement between O’Donnell & Schwartz and respondent, the client did not know or see Schwartz or O’Donnell, and the cases were not forwarded by O’Donnell & Schwartz to respondent; rather respondent forwarded the contracts of employment to O’Donnell & Schwartz and then respondent did the work of representing the client with only occasional consultation with Schwartz *105 and members of Ms firm. In most instances the work was entirely done by respondent without any contact with Schwartz or members of his firm. The 25% share of the contingent fee payable to O’Donnell & Schwartz, however, caused the system to operate because O’Donnell & Schwartz, by their direction as general counsel for the union, caused respondent to be publicized to union members as an attorney to represent them and directed union officials to take clients to respondent.
Eespondent’s contention that the action of the board violates the First and Fourteenth Amendments of the Constitution of the United States and is in direct contravention of the principles laid down in the case of National Association for the Advancement of Colored People v. Button, Attorney General of Virginia (January 14, 1963), 371 U. S., 415, 9 L. Ed. (2d), 405, is without merit.
Mr. Justice Brennen was careful to point out that the decision in that case is not dispositive of cases such as the one now before us when, in his opinion, he said:
“Objection to the intervention of a lay intermediary, who may control litigation or otherwise interfere with the rendering of legal services in a confidential relationship, also derives from the element of pecuniary gain. Fearful of dangers thought to arise from that element, the courts of several states have sustained regulations aimed at these activities.”
At this point Mr. Justice Brennen inserted footnote 25, which reads in part as follows:
“* * * One aspect of the lay intermediary problem which involved the absence of evidence of palpable control or interference was an arrangement adopted by the Brotherhood of Eailroad Trainmen in 1930 under which union members having claims under the Federal Employers Liability Act were induced to retain lawyers selected by the brotherhood and to make 25% contingent fee agreements with such lawyers. The arrangement was struck down by several state courts. To the courts which condemned the arrangement it appeared in practical effect to confer a monopoly of FELA legal business upon lawyers chosen by the brotherhood. These courts also saw it as tending to empower the brotherhood to exclude lawyers from participation in a lucrative practice, and to cause the loyalties *106 of the union-recommended lawyers to be divided between the union and their clients. * * *”
Mr. Justice Brennen’s opinion continues:
“We intimate no view one way or the other as to the merits of those decisions with respect to the particular arrangements against which they are directed. It is enough that the superficial resemblance in form between those arrangements and that at bar cannot obscure the vital fact that here the entire arrangement employs constitutionally privileged means of expression to secure constitutionally guaranteed civil rights. There has been no showing of a serious danger here of professionally reprehensible conflicts of interest which rules against solicitation frequently seek to prevent. This is so partly because no monetary stakes are involved, and so there is no danger that the attorney will desert or subvert the paramount interests of his client to enrich himself or an outside sponsor. * * *
“Resort to the courts to seek vindication of constitutional rights is a different matter from the oppressive, malicious, or avaricious use of the legal process for purely private gain. Lawsuits attacking racial discrimination, at least in Virginia, are neither very profitable nor very popular. They are not an object of general competition among Virginia lawyers * * Therefore, the objections to the findings and recommendation of the board are overruled. The report and the recommendation of the board are confirmed. Cleveland, Bar Association v. Fleck (1961), 172 Ohio St., 467.

Report confirmed and judgment accordingly,

Taft, C. J., Zimmerman, Matthias, O’Neill, Griffith, Herbert and Gibson, JJ., concur.